IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

ANDREW JACKSON CHITWOOD,

Defendant.

CRIMINAL ACTION FILE
NO.  4:10-CR-29-RLV-WEJ

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Andrew Jackson Chitwood's

Preliminary Motion to Suppress Evidence and Statements [10].  The Court conducted

an evidentiary hearing on said Motion on September 29, 2010 [25], which has been

transcribed [26].  The parties have briefed the matter.  (See Br. Supp. Mot. Supp.

Evid. and Statements [30] ("Def.'s Br."); Resp. of United States to Def.'s Mot. Supp.

[32] ("Govt.'s Br."); and Def.'s Reply in Supp. of Mot. to Supp. [36].)  On the basis

of the testimony and evidence produced at that hearing, the undersigned **REPORTS**

that police had probable cause to arrest the defendant for suspected drug trafficking,

and that the search of his vehicle incident to that arrest which uncovered

incriminating evidence (i.e., drugs and a gun) was lawful.  Moreover, police

provided the defendant with Miranda warnings, and he in turn voluntarily made statements to police.  Therefore, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence and Statements [10] be **DENIED**.

## I.      STATEMENT OF FACTS

At approximately 5:00 p.m. on the date of Mr. Chitwood's arrest (May 3, 2010), Bartow County Drug Task Force ("DTF") Agent Adam Belcher met with a confidential informant ("CI").[1]  (Tr. 5-6, 52.)  Although this CI was registered with the DTF, neither Agent Belcher nor any other officer had worked with him before.  (Id. at 5, 47.)[2]  The CI identified Mr. Chitwood as someone from whom he had purchased, and could purchase, drugs.  (Id. at 5, 50, 77, 83.)  Agent Belcher conducted no independent investigation of the CI's claim that he could buy

---

[1] Agent Belcher has worked for the Bartow County Sheriff's Office since March 1, 2006.  (Tr. 4.)  Before that, he served four years as a police officer in the United States Air Force.  (Id.)

[2] The impetus for the CI's cooperation flowed from his earlier arrest on unrelated drug charges.  (Tr. 5, 47-48.)  DTF agents offered not to take him to jail if he agreed to cooperate in drug-related investigations.  (Id. 48-50.)  The CI had recently been released from prison, where he had served time for drug-related charges, and was on parole.  (Id. at 51.)  DTF agents believed that the CI had a source of supply since he had just been arrested with methamphetamine.  (Id. at 52.)

2

methamphetamine from Mr. Chitwood. (Id. at 53.)[3] Agent Belcher also did nothing to assess the CI's reliability. (Id. at 52.) He neither ran a criminal background check on the CI nor made contact with his parole officer. (Id. at 51-52.) Agent Belcher made no promises to the CI in exchange for his cooperation; moreover, the CI received no money for his services. (Id. at 50-51.)

Under the direction of law enforcement and in Agent Belcher's presence, the CI made three consensually recorded telephone calls to Mr. Chitwood before his arrest. (Tr. 6.) Agent Belcher listened to the CI's half of the call and then listened to the recordings at their conclusion in order to hear both sides. (Id. at 31-32, 43, 76.)

During the first recorded call, which occurred at about 5:09 p.m., the CI called Mr. Chitwood, identified by the CI as "Andy," and said, "I've got $5200 on me."[4] (Tr. 6, 32, 34, 36, 38; a CD-ROM of those recordings is Def.'s Ex. 2.) Mr. Chitwood asked the CI if he would travel south to meet him. They established a meeting place at Glade Road. (Tr. 7, 35.)

---

[3] Before this date, the DTF had no knowledge that the defendant was engaged in the drug trade. (Tr. 28-29, 53.)

[4] The $5200 that the CI supposedly had on him was more than enough cash to purchase four ounces of methamphetamine. (Tr. 97.)

3

The second recorded call between the CI and Mr. Chitwood began with the CI calling Mr. Chitwood.  (Tr. 7-8; Def.'s Ex. 2.)  Mr. Chitwood did not answer his telephone, but he almost immediately called back to the CI's telephone.  (Tr. 8, 36-37.)[5]  During this conversation (which ended at approximately 5:23 p.m.), the CI asked Mr. Chitwood, "You're going to bring me four, right?"  (Id. at 8, 32, 37-38, 94.)[6]  Mr. Chitwood responded, "Yeah."  (Id. at 37.)  Mr. Chitwood also asked how long it would be before the CI arrived to the meet location, and the CI responded that it would be twenty minutes.  (Id. at 77.)  Mr. Chitwood replied, "That's how long it takes you to get to my house."  (Id.)[7]

In a third consensually recorded conversation (which ended at approximately 5:38 p.m.), the CI and Mr. Chitwood again discussed where their meeting would take place.  (Tr. 39-40; Def.'s Ex. 2.)  Agent Belcher conceded that there was no mention

---

[5] The Court treats these two calls as one because they are together on the recording and occurred back-to-back.

[6] Agent Belcher had directed the CI to ask Mr. Chitwood for four ounces of methamphetamine.  (Tr. 8.)

[7] Agent Belcher interpreted this statement to mean that the CI had been to Mr. Chitwood's residence.  (Tr. 77.)

4

of drugs or even code words for drugs in any of the recorded calls.  (Tr. 32, 38).

There was also no mention of the purpose of their meeting in the calls.  (Id. at 38.)

However, from these recorded conversations, and because Agent Belcher had

directed the CI to request four-ounces of methamphetamine from Mr. Chitwood,

Agent Belcher and DTF Agent John Cheek (who was assisting Agent Belcher)

believed that the defendant was planning to meet the CI to provide him with

four-ounces of methamphetamine in exchange for cash.  (Tr. 8, 28, 38, 76, 91-92.)

In addition to the recorded telephone calls, the CI described Mr. Chitwood's

physical appearance as being "a shorter white male that had several tattoos" who was

of "stocky, not heavy" build.  (Tr. 8.)  The CI also initially informed officers that Mr.

Chitwood would arrive at their meeting on a motorcycle, but he later reported that

the defendant would arrive in a vehicle.  (Id. at 8-9, 37.)

Once the meet location was fixed at a gas station on Glade Road, police staged

in an area where they could observe the meet location from a distance that allowed

them to see clearly what was going on.  (Tr. 9-11, 41, 78, 95.)  The CI and Agent

Pettepher (who was working in an undercover capacity) then drove to the meet

location.  (Id. at 10.)  Before departing for the meet location, Agent Belcher searched

the CI to make sure that he was not carrying any contraband–he was not.  (Id. at 10,

52, 78.)  Police also outfitted the CI with a transmitter that allowed them to hear both sides of any conversation he had at the meet location.  (Id. at 13, 45-46.)  Police also gave the CI a coded "take down" signal that he was instructed to speak if he saw Mr. Chitwood with the drugs.  (Id. at 10, 44-45.)

When the CI and the undercover agent arrived at the gas station where they were to meet Mr. Chitwood,[8] Agent Belcher and other law enforcement officers conducting surveillance observed a blue Chevrolet Tahoe parked at the gas pumps. (Tr. 11, 41.)  As the CI and the undercover agent pulled into the gas station, law enforcement saw a short, white male wave to the CI, who returned the greeting.  (Id. at 11-12, 92-94, 95-96.)  That subject, later identified as Mr. Chitwood, matched the description provided by the CI.  (Id. at 15-16, 78, 92-93.)  As police observed Mr. Chitwood crossing the parking lot of the gas station, they did not observe any outward indication that he was involved in criminal activity.  (Id. at 29-30.)  Mr. Chitwood then entered the aforementioned Chevy Tahoe.  (Id. at 11.)

After the undercover agent parked the car, the CI exited that vehicle and entered the rear of Mr. Chitwood's Tahoe on the passenger side.  (Tr. 13.)  Agent

---

[8] The CI received another call from the defendant, which was not recorded, in which Mr. Chitwood advised that he was at the meet location.  (Tr. 40-41.)

AO 72A
(Rev.8/82)

Belcher could hear the conversation between the CI and Mr. Chitwood over the transmitter while the two were in the Tahoe.  At no time did Mr. Chitwood express surprise over the CI's entry into the Tahoe and did not order him to leave.  (Id.) Although he could recall no specifics from that conversation between Mr. Chitwood and the CI, Agent Belcher testified that, in his opinion, their conversation confirmed that a drug transaction was about to occur.  (Id. at 13, 46, 79.)

The CI stayed in the Tahoe for only 20 to 30 seconds before exiting and giving the take down signal.  (Tr. 14, 46)  Once that signal was made, police moved in to arrest Mr. Chitwood and blocked the Tahoe from the front and rear using their vehicles.  (Id. at 14-15.)[9]  Police did not completely block Mr. Chitwood's path of escape; he could drive forward and to the right to leave the scene.  (Id. at 54.)

Clothed in marked raid vests, police got out of their vehicles with guns drawn, identified themselves as law enforcement officers, and ordered Mr. Chitwood to put his hands in the air.  (Tr. 15, 54-55, 79.)  Instead of doing as instructed, Mr. Chitwood placed the Tahoe into reverse, "slammed on the accelerator and quickly backed into Captain [Mark] Mayton's vehicle," which was parked behind the Tahoe.

_____

[9] The agents could not see into the Tahoe.  (Tr. 45.)  Before receiving the take down signal, agents had not witnessed an exchange of drugs between the defendant and the CI.  (Id. at 28.)

(Id. at 14-15.)  Officers standing directly in front of the Tahoe ordered Mr. Chitwood to stop and again directed him to put his hands in the air.  (Id. at 15.)  This time, Mr. Chitwood complied.  (Id. at 15-16.)

Once the Tahoe was in park, and Mr. Chitwood and his female passenger (Cecelia McCarthy) had their hands in the air, Agent Belcher opened the driver's side door, pulled Mr. Chitwood from the vehicle, placed him on the ground, cuffed him, and placed him under arrest.  (Tr. 16, 60-62.)[10]  As he was doing so, Agent Belcher saw on the driver's floorboard a clear plastic baggie that contained what appeared to be methamphetamine.  (Id. at 16-17, 63.)

Once under arrest, both Mr. Chitwood and the female passenger were searched.  (Tr. 17, 63.)[11]  In Mr. Chitwood's jacket pocket, police found two bags of suspected methamphetamine, a bag of suspected marijuana, and $1,407 in cash.  (Id. at 18.)  A search of the Tahoe revealed, in addition to the baggie of suspected methamphetamine found on the front driver's floorboard, baggies of suspected methamphetamine on the passenger's front floorboard, between the center console

_____

[10] The arrest occurred at approximately 5:50 p.m.  (Tr. 19, 66.)

[11] After the arrest, DTF agents searched the CI for drugs and again found none. (Tr. 44.)

and the passenger seat, and in the center console.  (Id. at 17, 63.)  Officers also discovered a loaded .9 mm Sig handgun in the Tahoe's glove box.  (Id. at 17.)[12]

Mr. Chitwood, who had been taken to a police van on site, complained of a "panic attack," and told officers that he had swallowed a quarter of an ounce of methamphetamine. (Tr. 18, 63-64, 84, 98.)  That quantity of methamphetamine, if taken all at once, could be an overdose.  (Id. at 64.)  Therefore, police called Bartow County EMS, who took Mr. Chitwood to the hospital via ambulance.  (Id. at 18, 64-65.)  DTF Agent Nathan Gibbs rode in the ambulance along with Mr. Chitwood. (Id. at 18-19, 65, 84.)[13]  Agent Gibbs removed the handcuffs from the defendant within five minutes of their arrival at the hospital.  (Id. at 90.)

_____

[12] After Mr. Chitwood's arrest, police impounded his Tahoe pursuant to standard written policy.  (Tr. 25-26; Govt. Ex. 2.)  As part of that process, Agent Belcher prepared an inventory sheet.  (Tr. 28.)

[13] The EMT who treated Mr. Chitwood during the ambulance ride did not believe that he had swallowed methamphetamine, since he displayed no overdose symptoms. (Tr. 85.) Mr. Chitwood did not seem confused or unable to focus on the EMT's questions during the ride to the hospital.  (Id. at 86.)  No emergency procedures were performed on Mr. Chitwood because of either elevated blood pressure or heart rate.  (Id. at 86-87.)  Agent Gibbs also believed that Mr. Chitwood had consumed no methamphetamine.  (Id. at 85.)  However, Agent Belcher testified that the defendant was sweating profusely (but it was a warm day and he was wearing a jacket).  (Id. at 65.)  Profuse sweating can be sign of methamphetamine intoxication.  (Id.)

Agent Belcher arrived at the hospital approximately 40-45 minutes after Mr. Chitwood's arrest. (Tr. 19, 66.)  When Agent Belcher arrived, Mr. Chitwood was being treated for possible methamphetamine ingestion using a liquid charcoal solution that flushed drugs out of his body through his bowels (i.e., by inducing diarrhea).  (Id. at 19, 66-68.)  Agent Belcher, who is trained in detecting the symptoms of methamphetamine overdose, testified that Mr. Chitwood did not display any of those symptoms while he was at the hospital.  (Id. at 81.)

At the hospital, Agent Belcher observed that Mr. Chitwood was alert, conscious, not disoriented or confused, and displayed no adverse physical symptoms other than having to use the bathroom repeatedly.  (Tr. 20, 81.)[14]  At approximately 8:23 p.m., Agent Belcher provided Mr. Chitwood with his Miranda rights both orally and in writing, and advised him to read those rights for himself as listed on a printed form.  (Id. at 20-22, 66.)  That form, a "Rights Waiver," signed by Mr. Chitwood and Agent Belcher (and witnessed by Captain Mayton), lists the usual Miranda rights in paragraphs 1 through 5, then asks a series of questions which can be answered by

---

[14] Captain Mayton, who is a certified paramedic, was with Agent Belcher and consulted with the hospital medical personnel about Mr. Chitwood's condition. (Tr. 68, 80.)

circling "yes" or "no."  The form executed by the defendant provides the following answers to those questions:

|  |  |
|---|---|
| Do you understand the English language? | Yes |
| Do you understand these rights? | Yes |
| Having these rights in mind will you talk to me/us? | Yes |
| Have you been threatened in any manner? | No |
| Have you been promised anything? | No |
| Have you been forced in any way to make statements? | No |

(Govt. Ex. 1.)

Mr. Chitwood was sitting in the hospital bed when agents provided Miranda warnings to him.  (Tr. 23, 69.)  Mr. Chitwood seemed to understand what the agent read to him–he provided no nonsensical answers to questions the agent asked, and he indicated that he had two years of college education.  (Id. at 22-23, 69-70.)  He stated that he understood his rights and was willing to make a statement.  (Id. at 23.)  No threats were made against Mr. Chitwood to get him to speak to officers, and no promises were made to him.  (Id. at 23, 71-72, 74.)

Mr. Chitwood asked the officers what, if anything, was going to happen to his girlfriend. (Tr. 71.)  Agent Belcher advised the defendant that his girlfriend had been

11

charged with drug trafficking and with the gun found in the vehicle, but he did not promise to treat her more favorably if the defendant cooperated.  (Id. at 71-72.)

While Mr. Chitwood was being provided his Miranda warnings the officers did not have their guns drawn, and only Agent Belcher and Captain Mayton were present. (Tr. 23.)  Mr. Chitwood was not handcuffed.  (Id. at 72, 90.)  No doctors or nurses were present in the hospital room (although nurses came in and out of the room to check on the defendant).  (Id. at 23, 68.)  Mr. Chitwood was allowed to use the restroom any time he wished before and during his interrogation.  (Id. at 23-24, 67.)  Mr. Chitwood never invoked his right to remain silent or to have an attorney present.  (Id. at 72, 80.)

## II.   **THE CHARGING DOCUMENT**

On June 22, 2010, the grand jury returned a three-count Indictment with a forfeiture provision [1] against Mr. Chitwood concerning conduct allegedly occurring in this District.  Count One alleges that, on or about May 3, 2010, the defendant knowingly and willfully possessed with intent to distribute more than 50 grams of methamphetamine (including a mixture and substance containing a detectable amount of methamphetamine), a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  (Indict. Count One.)  Count

12

Two charges that, on or about May 3, 2010, the defendant, having been convicted of five prior felonies in various Superior Courts of the State of Georgia, did possess a firearm in and affecting commerce (i.e., a 9 mm Sig Sauer P250, semi-automatic pistol and 9 mm ammunition), in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Id. Count Two.)  Finally, Count Three charges that, on or about May 3, 2010, the defendant knowingly and willfully, and by use of a deadly weapon (i.e, a motor vehicle), did forcibly assault, resist, oppose, impede, intimidate, and interfere with M.M., an officer of the United States and a person designated in 18 U.S.C. § 1114, while M.M. was engaged in and on account of the performance of official duties, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

## III.   **CONTENTIONS OF THE PARTIES**

Defendant asserts that he was arrested without probable cause based upon an uncorroborated tip from the CI.  Although the CI placed calls to him to arrange a meeting, defendant asserts that the calls were vague and failed to establish the purpose of that meeting. (Def.'s Br. 1.)  Additionally, Mr. Chitwood asserts that the CI entered his vehicle and then signaled for law enforcement to arrest him, purportedly based on the presence of drugs.  However, the only evidence that the meeting involved drugs came from the unreliable CI.  (Id. at 2.)  Mr. Chitwood

13

argues that, because he was arrested without probable cause, the drugs and gun found in his vehicle should be suppressed as "fruits of the poisonous tree." (Id. at 19.) Finally, defendant asserts that the statements he made at the hospital should be suppressed as fruits of the unlawful arrest (id.), and because they were not voluntarily made but coerced, given his physical condition at the time. (Id. at 21.)

The Government responds that Mr. Chitwood's arrest was based on probable cause. A CI with personal knowledge of the defendant's drug sales provided information that was corroborated by independent police investigation. Moreover, the police requested the CI to call the defendant and request four ounces of methamphetamine. In their recorded conversations, the defendant agreed that he would bring "four" to the meeting and knew that the CI had $5200, more than enough cash to buy that much methamphetamine. Their meeting was for the purpose of exchanging cash for drugs. Because the evidence at issue (i.e., drugs and a gun) was the product of a search incident to that lawful drug-related arrest, the Court should deny defendant's motion to suppress evidence. Finally, the Government contends that its agents provided Miranda warnings to the defendant, and that any inculpatory statements by Mr. Chitwood were knowingly and voluntarily made and should not be suppressed. (Govt.'s Br. 2.)

14

## IV.   ANALYSIS

### A.   Motion to Suppress Evidence

#### 1.   Probable Cause Existed for the Defendant's Arrest

"As a general rule, the Fourth Amendment to the United States Constitution prohibits state actors from making searches or seizures of the person in the absence of probable cause."  United States v. Dunn, 345 F.3d 1285, 1288 (11th Cir. 2003) (footnote omitted).  Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense."  Dahl v. Holley, 312 F.3d 1228, 1233 (11th Cir. 2002) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)).[15]  Most important, probable cause deals with probabilities.  It is a factual and practical consideration of everyday life on which reasonable and prudent people, not technicians, act.  Brinegar v. United States, 338 U.S. 160, 175 (1949).

---

[15] Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers would cause a prudent person to believe that the suspect has committed or is committing an offense.  Beck v. Ohio, 379 U.S. 89 (1964); Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc).  A court may examine the collective knowledge of law enforcement officers if they maintained at least a minimal level of communication during their investigation.  United States v. Willis, 759 F.2d 1486 (11th Cir. 1985).

15

Moreover, "probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) (quoting Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990)). "[P]robable cause 'must be judged not with clinical detachment but with a common sense view to the realities of normal life.'" Marx, 905 F.2d at 1506 (quoting Wilson v. Attaway, 757 F.2d 1227, 1235 (11th Cir. 1985)). "Probable cause does not require the same 'standard of conclusiveness and probability as the facts necessary to support a conviction.'" Dunn, 345 F.3d at 1290 (quoting Wood v. Kesler, 323 F.3d 872, 873 (11th Cir. 2003)).

Probable cause may also arise from information provided by an informant. "In determining whether an informant's tip rises to the level of probable cause, [the court must] assess the totality of the circumstances." Ortega, 85 F.3d at 1525 (citations omitted). A court must consider "the relevance of factors such as the informant's 'veracity,' 'reliability,' and 'basis of knowledge.' In addition, the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis." Id. (citations omitted); see also Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009) (quoting Ortega factors).

16

The CI here was new; thus, his past reliability was something that Agent Belcher could not assess.[16]   However, Agent Belcher took several precautions to insure that the CI was not simply sacrificing an innocent person to satisfy his obligations to the DTF.[17]   For example, Agent Belcher obtained a description from the CI of his source of supply that matched the person officers observed at the gas station waiving to the CI upon his arrival.  Moreover, Agent Belcher directed the CI to make recorded calls to his source to arrange a purchase of four ounces of methamphetamine, and to let the source know that he (the CI) had sufficient funds to make the purchase ($5200).  The person on the other end of the phone, called Andy by the CI, was familiar with the CI, and his comments indicated that the CI had been to the source's home before (apparently to buy drugs).  The calls also set the meeting location, which required substantial travel by both the source (from the south) and the CI (from the north) to make the deal happen.  They obviously were

_____

[16] Although defendant faults Agent Belcher for not checking the CI's criminal history or interviewing his parole officer, under the totality of the circumstances, such steps were unnecessary.  Agent Belcher knew that this CI was not a choir boy; moreover, as discussed in the text infra, the steps he took were sufficient to allow him to judge the CI's veracity, reliability, and basis of knowledge.

[17] It is true that the DTF knew nothing about Mr. Chitwood until the CI identified him as his source of supply.  However, that is not surprising since Mr. Chitwood lived well south of Bartow County.

17

not meeting just to say hello.  To confirm that, Agent Belcher supplied the CI with a transmitter and directed him to give a take down signal when he spotted drugs.[18] When the CI entered the defendant's Tahoe, the conversation agents heard sounded like one that would be expected at a drug transaction.  See Ornelas v. United States, 517 U.S. 690, 700 (1996) ("[A] police officer may draw inferences based on his own experience in deciding whether probable cause exists.").  Moreover, after the CI gave the take down signal and officers opened the vehicle's door, drugs were seen in plain view.

Defendant is correct that neither the CI nor the defendant ever used the words "drugs" or "ounces" in their conversations.  That is not uncommon in arranging drug transactions.  However, given the CI's request (at Agent Belcher's direction) to the defendant (for four ounces of methamphetamine), the defendant's confirmation that he could supply four (i.e., obviously four ounces of that drug), and the defendant's knowledge that the CI had a substantial amount of cash to spend, the factual and practical considerations of everyday life, Brinegar, 338 U.S. at 175, lead to the conclusion that a drug deal was imminent.  In sum, the CI's initial tip, that he could

---

[18] Defendant attacks Agent Belcher's supposed lack of experience. (Def.'s Br. 13.)  However, Agent Belcher is experienced.  (See supra note 1.)  Moreover, the numerous steps he took to confirm the CI's story belies any claim of inexperience.

AO 72A
(Rev.8/82)

obtain methamphetamine from Mr. Chitwood, was corroborated through Agent Belcher's investigation, including the recorded phone calls arranging the transaction and the appearance of Mr. Chitwood, matching the CI's description, at the agreed-upon meeting place. Thus, when they arrested Mr. Chitwood, officers had probable cause to believe that he was engaged in drug trafficking.[19]

### 2.   The Search of the Tahoe Incident to Arrest Was Lawful

The Court has found that there was a lawful custodial arrest here. In <u>Chimel v. California</u>, 395 U.S. 752 (1969), the Supreme Court held that a lawful custodial arrest creates a situation that justifies the contemporaneous search without a warrant of the person arrested and of the area immediately surrounding him. Such searches were deemed valid because of the need to remove any weapons that the arrestee

---

[19] Once the CI gave the take down signal, officers had at least reasonable suspicion sufficient to permit a <u>Terry</u> stop. <u>See</u> <u>United States v. Lindsey</u>, 482 F.3d 1285, 1290 (11th Cir. 2007). At that point, even if officers lacked probable cause to arrest from information provided by the CI, independent probable cause to arrest arose when Mr. Chitwood rammed his Tahoe into Captain Mayton's vehicle. Defendant's argument that officers cannot create the exigencies justifying a warrantless search or seizure is unavailing. (<u>See</u> Reply at 7-8 (citing <u>United States v. Tobin</u>, 923 F.2d 1506, 1511 (11th Cir. 1991)).) The officers did not create the exigent circumstance of Mr. Chitwood ramming his vehicle into Captain Mayton's vehicle. Mr. Chitwood's act created the probable cause.

19

might seek to use in order to resist arrest or effect his escape, and the need to prevent the concealment or destruction of evidence.  Id. at 762-63.

In New York v. Belton, 453 U.S. 454 (1981), the Court applied Chimel, which dealt with the search of a residence incident to an arrest, to the search of an automobile incident to an arrest.  There, the Court held that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile, including the contents of any containers found within the passenger compartment.  The purpose of a search incident to arrest is to find weapons that the suspect may use to injure police officers and to collect and preserve evidence.  Id. at 460-61.

Most recently, in Arizona v. Gant, 129 S. Ct. 1710 (2009), the Supreme Court modified Belton and held that officers are authorized "to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or if "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Arizona v. Gant, 556 U.S. ---,---, 129 S. Ct. 1710, 1719 (2009) (quotation omitted).  "If the offense of arrest supplies a basis for a search incident to arrest, the

20

officer may search 'the passenger compartment of an arrestee's vehicle and any containers therein.'" United States v. Lightbourn, 357 F. App'x 259, 264 (11th Cir. 2009) (per curiam) (quoting Gant, 129 S. Ct at 1719).

The undersigned concludes that it was reasonable for the officers here to believe that evidence relevant to the crime of arrest (i.e., drug trafficking) might be found in Mr. Chitwood's vehicle. Thus, under Gant, it was permissible for them to search any area of the vehicle in which that evidence might be found.[20] As discussed above, based on a tip from a CI which they had corroborated through independent investigation, officers had just pulled Mr. Chitwood from his vehicle following a drug buy/bust operation. In so doing, they saw in plain view on the driver's floorboard a baggie of suspected methamphetamine. They had in their a custody a man who had traveled from some point south to Glade Road in Bartow County for the purpose of selling four ounces of methamphetamine to someone he did not know was a CI, but whom he believed had up to $5200 to spend on drugs. Given those undisputed facts, the officers had a reasonable belief that criminal conduct (possession of illegal drugs) had occurred and that evidence of that conduct (illegal

---

[20] For the purposes of this report and recommendation, the undersigned assumes that Mr. Chitwood could not have accessed the vehicle and did not pose a safety risk to the officers.

21

drugs) might be found in the vehicle.  Therefore, the search of the Tahoe was authorized under the circumstances, regardless of whether Mr. Chitwood was a safety risk or could have accessed the vehicle.  Therefore, Mr. Chitwood's Motion to Suppress the items found in his vehicle (i.e., drugs and a gun) should be **DENIED**.[21]

### B.  Motion to Suppress Defendant's Statements

In Jackson v. Denno, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury.  Title 18 U.S.C. § 3501(a) codifies the Jackson v. Denno requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the

---

[21] Even if the search incident to arrest was unlawful, the doctrine of inevitable discovery applies.  United States v. Ethingor, No. 09-13342, 2010 WL 2836755, at *2 (11th Cir. July 21, 2010) ("[U]nder the inevitable discovery exception to the exclusionary rule, evidence obtained through an illegal search may nonetheless be admitted at trial if 'the information ultimately or inevitably would have been discovered by lawful means.'") (unpublished op.) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).  Officers here impounded the Tahoe and were authorized to conduct an inventory search under Bartow County Sheriff's Office Policy.  See supra note 12.  Thus, the guns and drugs would have been found.

AO 72A
(Rev.8/82)

presence of the jury, determine any issue as to voluntariness." <u>United States v.</u>
<u>Davidson</u>, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government complied with the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary. <u>United States v. Jones</u>, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); <u>United States v. Sims</u>, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). The Court makes these inquiries separately below.

### 1. <u>Compliance with Miranda</u>

In <u>Miranda</u>, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. <u>Id.</u> at 478-79. These so-called <u>Miranda</u> warnings "are required before any statement may be admitted into evidence at trial which was elicited from

23

a person in custody through interrogation." <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248 (11th Cir. 1989).

The testimony at the hearing shows that Agent Belcher provided the Miranda rights to the defendant. He received them orally and in writing. He executed a form indicating that he heard his rights and that he understood them. Thus, the first prong of the two-part inquiry has been established.

## 2.     <u>Voluntariness</u>

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. <u>Jones</u>, 32 F.3d at 1516. In <u>Arizona v. Fulminate</u>, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. <u>Jones</u>, 32 F.3d at 1516-17. The standard applied in the Eleventh Circuit is as follows:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of

24

> realistic penalties for cooperative and non-cooperative defendants, are
> normally insufficient to preclude free choice.

Id. at 1517 (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th

Cir. 1992)), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420 (11th

Cir. 1994).

In this case, the evidence shows that Mr. Chitwood was not subjected to an

exhaustingly long interrogation, threatened, or promised anything. Police employed

no deception. Although Mr. Chitwood may have been required to get up out of bed

and go to the restroom periodically during the questioning, there is no evidence that

he was unable to understand what was happening or that he was under the influence

of any drugs. The Court is not persuaded that the defendant even ingested the one-

fourth ounce of methamphetamine as he claimed. However, even if he did, there is

no probative evidence that he suffered any side-effects sufficient to prevent him from

understanding Miranda or that rendered his statements involuntary. Thus, under the

totality of the circumstances, the Court must conclude that Mr. Chitwood made a

knowing, voluntary, and intelligent waiver of his right to remain silent. Therefore,

Mr. Chitwood's Motion to Suppress Statements should be **DENIED**.

25

V.    **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Preliminary Motion to Suppress Evidence and Statements [10] be **DENIED**.

**SO RECOMMENDED**, this 22nd day of December, 2010.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

ANDREW JACKSON CHITWOOD,

Defendant.

CRIMINAL ACTION FILE
NO. 4:10-CR-29-RLV-WEJ

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within fourteen days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court.  If no objections are filed, the Non-Final Report and

Recommendation may be adopted as the opinion and order of the District Court, and

any appellate review of factual findings will be limited to a plain error review.

United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

  The Clerk is directed to submit the Non-Final Report and Recommendation

with objections, if any, to the District Court after expiration of the above time period.


  **SO ORDERED**, this 22nd day of December, 2010.



WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2